NOTICE
Decision filed 08/12/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230792-U

NO. 5-23-0792

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 21-CF-1239 |
| | ) | |
| DAVUCCI D. CRAIG, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justice McHaney concurred in the judgment.[*]

**ORDER**

¶ 1    *Held*:    We affirm the defendant's conviction for first degree murder where defense counsel rendered unreasonable assistance of counsel, but the defendant failed to establish prejudice from defense counsel's deficient performance.

¶ 2    The defendant, Davucci D. Craig, was convicted on June 29, 2023, of first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2020)). He was sentenced on September 20, 2023, to 75 years' incarceration in the Illinois Department of Corrections (IDOC) and three years of mandatory supervised release. The defendant now appeals his conviction arguing that he received ineffective assistance of counsel where defense counsel

_____

[*]Justice Moore fully participated in this case prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

failed to correct an improper jury instruction, failed to make the proper objection when the State violated a pretrial motion order, and failed to properly object to inadmissible hearsay evidence. The defendant further argues that the cumulative effect of these plain errors denied him the right to a fair trial. For the following reasons, we affirm the defendant's conviction.

¶ 3                                      I. BACKGROUND

¶ 4     On October 14, 2021, the defendant was charged by information with four counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)), and one count of aggravated battery with a firearm (*id.* 12-3.05(e)(1)). These charges stem from a shooting incident that occurred on July 2, 2021, at an American Legion where over a hundred people were attending a repass being held in honor of David Dalton, who had been killed in June 2021. The shooting occurred in the parking lot and resulted in the death of Kieshaun Thatch, a severe injury to Charmeika Brown, and injuries to several other individuals. The defendant was charged in connection with Kieshaun's death and Charmeika's injury.

¶ 5     The case proceeded through a fitness determination and discovery. Then, on May 30, 2023, the State filed a notice pursuant to section 115-21 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/115-21 (West 2022)), regarding the testimony of James Mosley. Mosley and the defendant had been cellmates for several weeks, and Mosely had reported to officials that the defendant had admitted to shooting Kieshaun along with providing details of the offense. As such, the State was tendering its notice to call Mosley at trial and was requesting a hearing concerning the admissibility of said statements.

¶ 6     A hearing was held on June 15, 2023, and the State called Corey Phenicie, the lead detective on the case. Detective Phenicie testified concerning the three conversations he had with Mosley and stated that all three conversations were recorded. The conversations were conducted

on February 21, March 15, and March 25, 2023. At the first conversation, Mosley informed Detective Phenice that he and the defendant had a conversation during which they were discussing what offenses resulted in their incarceration. Mosley stated that the defendant stated that he had participated in the shooting at the repass and that he had shot into the crowd after seeing Kieshaun. Mosley also relayed how the defendant described getting away from the scene and going to his family home where they would not let him in the house, so he broke into the home, "punching walls, breaking windows, breaking televisions," and killed the family's small dog.

¶ 7    During the second and third conversations, Mosley stated that two individuals, Christopher Hugger and Derrek Lambert, who were both at the repass and injured during the incident, were shooting back at the defendant. Mosley also discussed the injury to Charmeika and fights in the jail related to the shooting. Detective Phenicie acknowledged that Mosley was not present at the American Legion and had no personal knowledge of the incident in question. Detective Phenicie also stated that Mosley's information stemmed from conversations that Mosley had with the defendant, from listening to conversations that the defendant had with other individuals, and from conversations Mosley had with individuals other than the defendant.

¶ 8    After Detective Phenicie's testimony, the trial court heard arguments. The State informed the trial court that it would not question Detective Phenicie or Mosley on what the defendant had stated to other individuals. The State further indicated as follows:

> "The State would be seeking in this motion to have Mr. Mosley testify that [the defendant] at the time that they were cellmates told him that he shot Kieshaun Thatch. That he was at a repass, saw Kieshaun Thatch standing outside, started shooting into the crowd, and people started shooting back at him. That is the

3

statement that the State is seeking to elicit, as well as the defendant then fleeing the scene. That is the limited—the limited extent of it."

¶ 9 Upon completion of the arguments, the trial court went through the requirements and considerations required for a motion under section 115-21 of the Criminal Code (725 ILCS 5/115-21 (West 2022)), and held as follows:

"I do find that the State has shown by a preponderance of the evidence that Mr. Mosley's testimony would be reliable. And therefore, the court is going to grant the motion to the extent that it's limited to the first interview of Mr. Mosley so that it's the statements that Mr. Mosley says the defendant himself made."

¶ 10 A four-day jury trial began on June 26, 2023. There were numerous witnesses called during the trial and as such, we will provide only a brief summary of the witnesses' testimonies and supplement any testimony, as needed, in our analysis below. The State began its case by calling Shatekia Thatch. Shatekia testified that she was Kieshaun's mother, the sister of David Dalton, and that she had attended the repass that was conducted in David's honor at the American Legion. Shatekia stated that she was inside when the shooting began but went outside when she was told that her son had been shot. Shatekia testified that she saw her son lying on the ground and stayed with him until the ambulance arrived. Shatekia stated that her son was 17 years old at the time of his death.

¶ 11 Sergeant Austin Massey, with the City of Champaign Police Department, testified regarding his arrival at the "extremely chaotic scene." Sergeant Massey described finding Kieshaun on the ground, his attempt to render aid, and that Kieshaun had "too many" gunshot wounds to count at that time. Sergeant Massey stated that he had started chest compressions, even though there was no sign of life, and remained on scene until an ambulance arrived.

4

¶ 12     Officer Douglas Wendt, with the City of Champaign Police Department, testified concerning the crime scene and the evidence collected at the scene. Officer Wendt stated that 106 shell casings from 8 firearms were collected from the American Legion's parking lot. Based upon the casings, one of the firearms was a .40 caliber, and the rest were 9-millimeter handguns. It was determined that one of the 9-millimeter weapons fired 32 of the shell casings that were found near Kieshaun's body. No weapons connected to any of the casings were recovered from the scene.

¶ 13     Doctor Shiping Bao, a forensic pathologist, testified that he performed Kieshaun's autopsy on July 3, 2021. Dr. Bao stated that Kieshaun had a total of 16 gunshot entrance wounds, 12 exit wounds, and that 4 projectiles were recovered from his body. Dr. Bao determined that the cause of Kieshaun's death was massive hemorrhage caused by perforations of the liver, spleen, left lower lobe of the lung, and diaphragm.

¶ 14     Sergeant Bradley Krauel, with the City of Champaign Police Department, testified regarding his qualification as an expert in firearms. The defense objected to Sergeant Krauel as an expert, and that objection was overruled by the trial court. Sergeant Krauel proceeded to testify regarding the projectiles that were recovered from Kieshaun's body during his autopsy. Sergeant Krauel opined that the projectiles likely came from a 9-millimeter caliber weapon and that the projectile taken from Charmeika was also from a 9-millimeter caliber weapon.

¶ 15     Calvin Thatch, Shatekia's brother and Kieshaun's uncle, testified that he was familiar with the defendant because his brother, the decedent David Dalton, had children with the defendant's sister. Calvin stated that he was inside the building when the shooting occurred, so he did not observe anyone firing a weapon. Calvin also testified that he was aware of a fight between the defendant and the victim, but it was a year or two before the shooting. Calvin denied previous

5

statements in which he had stated to law enforcement that the defendant stood over his nephew and shot him. Calvin testified that he had just repeated what he had heard.

¶ 16    Precious Dorris was called and testified that she did not know anyone by the name of David Dalton, and could not recall whether she had attended his funeral or the repass. Precious testified that she did know an individual by the name of Andre Runge and that she recalled a detective asking her about a telephone call from Runge, who was incarcerated at the time, in July 2021. To all of the remaining questions, Precious testified that she could not remember or recall. The State went on to question Precious as follows:

> "Q. Do you recall Mr. Runge saying, 'I am just saying, though, do you know who did it?' And your response, 'Do I know who did it? Yeah. Yeah.' And Mr. Runge saying, 'What is the name start with? E? Is there an E?' You saying, 'Oh, no. That's the wrong name, baby.' Andre—Mr. Runge saying, 'What's it start with?' You saying, 'D.' Do you recall any of that?
>
> A. I don't recall.
>
> Q. Do you recall Mr. Runge saying, 'And it rhymes with something like Nell?' Your response, "No. No. On my mama, no. It ain't got nothing to do with them.'
>
> Do you recall that?
>
> A. I don't recall.
>
> * * *
>
> Q. Mr. Runge says, 'All right. What is dude's nickname?' You said, 'Man, I am probably not going to tell you. I don't know if you know him.' Andre [Runge] saying, 'Is it somebody I be with?' Precious, you said, 'No. You used to. You don't remember?' Andre [Runge] says. 'It starts with a V. Vucci?' and you said, 'You, you a dummy.' And Mr. Runge says, 'Ah, ah, sh*t.' Your response, 'On my mama. On my mama, it was him. In broad daylight. No mask, no nothing. Boom.' Andre [Runge] says, 'He going down, though.' You said, 'I know. Way too many cameras out there. Way too many people out there. When I say he stood over the nig***, too, woo. It was like a movie.' And Andre saying, 'He was thirsty catching wine.' Do you remember that conversation?
>
> A. I don't."

¶ 17    During the remainder of Precious's testimony, including cross-examination, Precious continued to state that she did not recall or remember anything related to the telephone call with Runge. Defense counsel noted on cross-examination that "the State just read you, I'm presuming, a transcript of this phone call" but neither a transcript nor a recording of the telephone call were offered or admitted into evidence at that time.

¶ 18    Charmeika Brown was called and testified that she was pregnant on the day of the shooting and that the child's father was Dante Pickens. Charmeika stated that she was sitting inside her vehicle when she heard three or four shots fired, then heard more shots fired. Charmeika stated that she looked up and saw "everybody running and different people shooting."

¶ 19    Charmeika testified that the individuals she saw shooting were the defendant, Malik Chapple, Christopher Hugger, and Derrick Lambert. Charmeika stated that she started her vehicle, began to drive away, and then felt something hit her. Charmeika testified that she drove off and went through the parking lot gates, even though the gates were closed and locked, causing damage to her vehicle. She later stopped and her cousin drove her to the hospital because she was losing consciousness. Charmeika testified that she had been shot in the back and at the time of the injury, the defendant and Dante Pickens were running behind her vehicle.

¶ 20    Charmeika stated that she had previously told law enforcement that she could not remember anything because she had been in a lot of pain and did not want to speak with them. Also, on cross-examination, Charmeika stated that an individual named Brandon Wilson was also firing a weapon. Charmeika testified that she believed that she was shot accidentally because she did not believe anyone was shooting at her. At the time she first saw the defendant, Charmeika stated that people were chasing and firing at him. Charmeika testified that the defendant was wearing a red memorial shirt, which the majority of individuals at the repass were wearing.

7

¶ 21 Dante Pickens was called and testified that he was currently incarcerated and that Charmeika was the mother of his children. Dante stated that he was at the American Legion on July 2, 2021, when the incident occurred, because he had been a long-time friend of David Dalton. He testified that he did not know Kieshaun, but that he did know the defendant. Dante further testified that he did not see the shooting. The State then conducted the following examination:

> "Q. You were in the parking lot. Okay. Do you remember Detective Phenicie saying to you, 'So can you describe how it went down?' You—your response, 'Sh*t, I was just out there mingling through. And, uh, like I said, I was mingling through, and I was done mingling. I was walking down towards my girlfriend's truck because she was at the back, the back corner.' Detective Phenicie: 'That is Charmeika, I assume?' You: 'Yeah.' Detective Phenicie: 'Draw a square where she was.' You said, 'I was standing right next to him.' Detective Phenicie: 'So you are standing right next to the victim?' Your response, 'Yeah.' As I was walking back toward my girlfriend's truck, he was right on the side of me.'

> Do you remember saying all of that?

> A. Somewhat. Who was right on the side of me?

> * * *

> A. I didn't see nobody get shot.

> Q. Do you recall telling Detective Phenicie, 'I am walking toward the truck and I hear a shot and I turned around and he shot his a** three more times and I just froze, stuck, and he flicked a switch and then just got the sh*t shot out of him on the ground'?

> A. Yeah, I remember telling him all that.

> * * *

> A. I didn't see who shot nobody.

> Q. Do you recall telling—

> A. The only reason I told him that because my girlfriend at the time asked me to.

> * * *

Q. Okay. Detective Phenicie: 'So in your mind, this whole thing started because [the defendant] started shooting Kieshaun Thatch?' Your response, 'That is what it started." Do you recall saying that?

A. Yeah, I just told you the only reason I said that is because Charmeika asked me to.

Q. I understand what you're saying here today. Thank you. Detective Phenicie: 'Did anyone else shoot Kieshaun Thatch that you know of?' Your response, 'No. He killed that boy. I watched him kill that boy.' Do you recall saying that?

A. Yes. And, again, the only reason I said that is because Charmeika asked me to."

¶ 22    On cross-examination, Dante stated that everyone in the parking lot was drinking and that the information he gave to Detective Phenicie was stuff he heard from other people, not anything he personally saw. Dante stated again that it was his testimony that he did not see who actually shot Kieshaun. He further testified that he was in front of Charmeika's vehicle, not behind it, and that she almost ran him over as she was leaving the parking lot.

¶ 23    Dontarion Jordan, Kieshaun's cousin, testified that he was standing outside of the American Legion and saw the defendant shoot Kieshaun. Dontarion testified that he saw the shooting with his "own eyes" and when Kieshaun was on the ground, the defendant stood over Kieshaun and continued shooting. Dontarion admitted to having a weapon at the repass and stated that, upon seeing Kieshaun shot, he pulled the weapon out and attempted to shoot the defendant, but the weapon jammed. Dontarion admitted that he initially told law enforcement that Kieshaun was shot by multiple people, but he actually only saw the defendant shooting.

¶ 24    James Mosley, the former cellmate of the defendant, was called and denied writing any request slips to speak with officials regarding the defendant. Mosley stated that "I don't know how I got put inside of it," but admitted that he did talk to the detectives. Mosley stated that he did not "*per se*" have any conversation with the defendant about the shooting at the American Legion but

9

was present for a conversation. When asked the context of the conversation that he overheard, the defense objected to foundation. The trial court directed the State to provide "[a] little more foundation as to when it may have been."

¶ 25    Mosley stated that he had been a cellmate of the defendant for a week or two, but that the conversation occurred after they were no longer cellmates. Mosley testified that the conversation he overheard was in the common area and then again denied making any requests to speak with officials regarding the defendant. The State attempted to refresh Mosley's memory by showing him a request slip, but Mosley stated that he could not read it since he was "almost blind."

¶ 26    The State attempted to narrow down when the conversation concerning the defendant occurred, but Mosley could not remember. When asked about the conversation he overheard, Mosley stated that "I've told you I vaguely remember anything. I don't know how many times I have to tell you this. I vaguely remember anything." The defense again made a foundation objection noting that it was unclear where the conversation took place and/or who was present for the conversation. The trial court overruled the objection stating that "I think those are appropriate for cross-examination. I think an appropriate foundation based on the witness's answers have been shown. Go ahead."

¶ 27    On the State's examination, Mosley remembered that the defendant had stated that they were shooting at the American Legion and that "I heard him say he shot, but he never said who he shot." Mosley again stated that he had not completed the request forms, that there were two individuals by the same name incarcerated at that time, and that the State should probably be talking to the other person. On cross-examination, Mosley stated that he was incarcerated when the victim was shot and that he had no personal knowledge of the events that occurred at the

American Legion. Mosley testified that everything he knew about the event was obtained from multiple individuals, and acknowledged that he had no idea exactly who told him what.

¶ 28    Daphne Dalton, David Dalton's sister and Kieshaun's aunt, testified that she was at the repass and was outside when she saw Kieshaun "[s]tanding in the street by hisself" and then fall to the ground. Daphne testified that she saw the defendant shoot Kieshaun. She also testified that Kieshaun and the defendant had gotten into a physical altercation, but it was "months, months" before the shooting.

¶ 29    Daphne testified that she was surprised that Kieshaun was there because he was accused in the shooting death of another individual and there was some concern about him being there for that reason. Daphne stated that she did not know who started the shooting at the American Legion, but the only person she saw shooting was the defendant. On re-direct, the State asked the following:

> "Q. Do you not recall specifically what you told Detective Phenicie?
>
> Ms. Dalton, do you remember saying to Detective Phenicie, 'I just remember him putting his hands up and he got shot.' And Detective Phenicie saying, 'Did you see who the shooter was?' You saying, 'He had dreads, black hat, shirt with my brother on it." Detective Phenicie saying, 'You said he had a hat on. Was it a stocking cap?' And your response, 'It looked like it was.' And then Detective Phenicie said, 'Have you ever seen him before?' Your response, 'Yes. Him and Kieshaun got to fighting.' Detective Phenicie asked, 'Can you explain the details of that?' And your response, 'I looked out the window and they were fighting.'
>
> Do you remember that exchange with Detective Phenicie? If you don't remember, it's okay. I'm just asking if you remember that exchange.
>
> A. Not all that stuff."

¶ 30    Detective Robert Delong, with the City of Champaign Police Department, testified that he conducted a photographic lineup with Daphne Dalton. The defense objected since Daphne had not testified to participating in a photographic lineup. Given that it was late in the day, the trial court excused the witness and the jury to hear arguments on the objection.

11

¶ 31    The defense argued that Detective Delong had not been disclosed as a witness and that the State had not questioned Daphne regarding the line-up. Therefore, the defense argued it had no advance notice that the State would be pursuing anything regarding the photographic line-up. The State argued that Detective Delong was disclosed in police reports and that it was oversight that he was not on the State's witness list. The State noted that, prior to an earlier break, it had stated that it would be calling Detective Delong and that defense counsel had written the name of Detective Delong, along with Charmeika Brown who had also been left off the State's witness list, on the defense's copy of the State's witness list. The State further argued that the defense was aware of the photographic line-up and that the defense made a strategic decision not to ask Daphne regarding the line-up since she had identified the defendant. After arguments, the trial court discussed several cases and ultimately, denied the objection. Detective Delong was then recalled and testified that Daphne had circled the defendant's photograph in the line-up.

¶ 32    Dynasty Craig, the defendant's sister, was called and testified that she was 14 years old at the time of the shooting incident. Dynasty stated that she had been present at the repass, but had left with her mother before the shooting occurred. Dynasty testified that she remembered speaking to law enforcement, but stated that she had "fabricated a whole bunch of lies because I was sad at the time and clueless." She testified that one of lies that she had fabricated was that the defendant had told her that he had killed Kieshaun. Dynasty stated that she had lied because she had found her dog dead and blamed the defendant for the death of the dog. Dynasty also stated that after the incident, her family was getting threats to the point that they had to move into a hotel since "the word on the street" was that the defendant had killed Kieshaun.

¶ 33    Markeetia McFarland, the defendant's mother, testified that she has eleven children, and that six of her daughters and two of her sons were at the American Legion on the day of the

shooting. Markeetia stated that she was at the Legion for a short period of time, but left with Dynasty to go shopping so she was not present when the shooting occurred. After the incident, Markeetia stated that her family received threats and had to move into a hotel. Markeetia stated that she had heard rumors that her son, the defendant, was involved in the shooting, but she never contacted law enforcement or spoke with Detective Phenicie. Markeetia testified that all of her other children were inside the American Legion when the shooting transpired and that none of them saw anything that had occurred in the parking lot.

¶ 34 Megan Thatch, Kieshaun's great-aunt, testified that she resided in Texas, but had traveled to Illinois in order to attend the repass. Megan stated that she knew the defendant and was standing outside of the Legion when the shooting began. Megan testified that she heard two gunshots and saw Kieshaun fall. She also saw the defendant standing there and he fired four more times into Kieshaun while he was lying on the ground. Megan testified that there was no one else shooting at Kieshaun, but then other people started shooting and the defendant fled on foot.

¶ 35 The State's final witness was Detective Corey Phenicie with the City of Champaign Police Department. Detective Phenicie testified that he was the lead detective on the case and when he arrived at the American Legion on July 2, 2021, there was a loud commotion coming from the parking lot, a lot of yelling and screaming. There was a group of people around an individual on the ground, and that individual was being rendered aid by another officer. The officer rendering aid was beginning to tire so Detective Phenicie took over life-saving measures until an ambulance arrived.

¶ 36 Detective Phenicie stated that he then assisted with crowd control. Detective Phenicie stated that "in my 15 years [of] law enforcement, this is the most chaotic scene I've been part of. People were argumentative. They were combative. They were trying to fight police. They were

13

trying to push by the police. They were not cooperative." Detective Phenicie stated that people were ripping down the crime scene tape and that the majority of the crowd did not want to speak to the police about what they had witnessed.

¶ 37    Detective Phenicie stated that when he left the American Legion, he went to the hospital to check on the medical status of the victims. Besides Kieshaun and Charmeika, James Roger, Derrick Lambert, and Christopher Hugger had also received gunshot injuries. Detective Phenicie stated that Derrick Lambert, Christopher Hugger, Malik Chapple, and Brandon Wilson were later charged with weapon possession since witnesses' statements indicated that these individuals had been firing weapons at the American Legion.

¶ 38    Detective Phenicie went on to testify regarding the telephone call between Andre Runge and Precious Dorris; the statement he received from Dynasty Craig; his interviews with James Mosley; his interview with Calvin Thatch; and his interview with Daphne Dalton. Detective Phenicie testified that each of these events were recorded and the State moved to admit and publish clips from the recordings. The defense objected to the publishing of the interview with James Mosley, stating that it was the subject of a pretrial motion, and also objected to the admittance of the telephone conversation between Runge and Precious, although no basis for that objection was given. The objections were overruled and the clips were played for the jury.

¶ 39    On cross-examination, Detective Phenicie confirmed that Daphne Dalton had stated in her interview that she did not see who started the shooting, and that Calvin Thatch also indicated that he did not see how the shooting started. Detective Phenicie confirmed that there were at least eight people shooting since it was established that there were casings from eight different weapons. Detective Phenicie also testified that David Dalton was believed to be a member of the Roc Block gang and that gang's opposition would be "MOB." Detective Phenicie stated that he was not aware

14

of any gang affiliation of Kieshaun. Detective Phenicie acknowledged that, during the investigation, several individuals had indicated that there were people on the other side of the fence shooting into the American Legion parking lot. Detective Phenicie testified that he had investigated those claims and found no shell casings or evidence outside of the fence.

¶ 40    Upon completion of Detective Phenicie's testimony, the State rested. The defendant moved for a directed verdict which the trial court denied. The defense did not place any evidence before the jury and the matter proceeded with jury instructions. Relevant to this appeal, the following jury instruction was given by the trial court:

> "You have before you evidence that the Defendant made statements relating to the offenses charged in the information. It is for you to determine what weight should be given to these statements. In determining the weight to be given to a statement, you should consider all the circumstances under which it was made."

¶ 41    After the jury was instructed, the parties made closing arguments and the jury began deliberations. Upon completion of deliberations, the jury found the defendant guilty of the first degree murder of Kieshaun (720 ILCS 5/9-1(a)(2) (West 2020)), and not guilty of aggravated battery with a firearm (*id.* 12-3.05(e)(1)) concerning Charmeika's injury.

¶ 42    The defendant filed a motion for acquittal, or in the alternative, motion for new trial on July 25, 2023. The trial court denied the defendant's motion for acquittal at the sentencing hearing on September 20, 2023, and proceeded to sentence the defendant to 75 years' incarceration within the IDOC and three years of mandatory supervised release.

¶ 43    The defendant filed a motion to reconsider sentence, or in the alternative, for a new sentencing hearing on September 21, 2023. The trial court denied the defendant's motion on

15

September 28, 2023, and the same day, the defendant filed his notice of appeal bringing this matter before this court.

¶ 44                                    II. ANALYSIS

¶ 45     On appeal, the defendant argues that he received ineffective assistance of counsel at trial resulting in numerous plain errors that denied the defendant his constitutional right to a fair trial. The defendant argues that several of these clear and obvious errors require reversal individually, or in the alternative, that the cumulative effect of the errors denied him a fair trial and support reversal. Specifically, the defendant argues that defense counsel rendered ineffective assistance of counsel when counsel allowed the jury to receive an incomplete jury instruction, failed to properly object to the State's violation of a pretrial motion ruling, and failed to properly object to the State's repeated use of inadmissible hearsay statements.

¶ 46     Along with bringing these claims under a theory of ineffective assistance of counsel, the defendant argues these claims under the doctrine of plain error. The defendant states that "each error also constituted first prong plain error, and will also be analyzed under that framework." The doctrine of plain error, codified in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), bypasses normal forfeiture principles and allows a reviewing court to consider an error or defect that affects a substantial right even though the error or defect was not brought to the attention of the trial court. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The doctrine of plain error does not apply to issues properly preserved in the lower court. See *People v. Enoch*, 122 Ill. 2d 176, 186 (reviewing court may address forfeited issue under the doctrine of plain error).

¶ 47     Here, however, the defendant does not identify any of the issues appealed as being unpreserved or subject to forfeiture, nor does the State raise the issue of forfeiture in connection with any of the defendant's issues. In criminal cases, to preserve an issue for review, a defendant

16

must either raise it in a pretrial motion or an objection at trial and in a posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 18. It is not the function or the obligation of this court to act as an advocate and search the record to determine whether an issue has been properly preserved. See generally *Overt v. Saville*, 253 Ill. App. 3d 677, 682 (1993). We have, however, reviewed the record in the process of our analysis and determined that the defendant's issues regarding the jury instruction and the State's use of hearsay statements were not objected to at trial or raised in the defendant's posttrial motion. Thus, these issues were unpreserved and subject to forfeiture.

¶ 48 It further appears that the defendant's issue regarding the State's violation of a pretrial motion ruling was sufficiently raised in the defendant's posttrial motion and that an objection was made at trial. As such, this issue was preserved and is not apposite to a plain error analysis. It is, however, an issue that could be raised on direct appeal and as such, we will consider it as such. We will also consider it, as requested, under the defendant's claim of ineffective assistance of counsel. We caution, however, that this court will not always be so lenient and that prior to requesting this court conduct a plain error analysis, a party should identify and ensure that the issue is appropriate for such an analysis.

¶ 49 Regardless of whether an issue is brought before this court on a theory of ineffective assistance of counsel, under the doctrine of plain error, or simply an issue raised on direct appeal, the initial step is always to determine whether an error, if any, occurred. *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 110. Thus, we will first address the alleged errors in the order raised before proceeding with an analysis of whether the errors, if any, constituted ineffective assistance of counsel, reversible plain error, or cumulative error.

17

¶ 50                                    A. Jury Instruction

¶ 51    The defendant argues that the jury was improperly instructed since the written and oral instruction that the jury received regarding statements attributed to the defendant was incomplete. At issue is Illinois Pattern Jury Instructions, Criminal No. 3.06-3.07 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.06-3.07), "Statements by Defendant," which states in its entirety as follows:

> "You have before you evidence that *[(the) (a)]* defendant made [a] statement[s] relating to the offense[s] charged in the *[(indictment) (information) (complaint)]*. It is for you to determine [whether the defendant made the statement[s], and, if so,] what weight should be given to the statement[s]. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

¶ 52    The committee note to the instruction states that the bracketed phrase in the second sentence, that is, "[whether the defendant made the statement[s], and, if so,]" should be "deleted only when the defendant admits making all the material statements attributed to him." IPI Criminal No. 3.06-3.07, Committee Comments (Oct. 17, 2014). The bracketed phrase was deleted from the instruction given to the jury in this matter.

¶ 53    The defendant argues that he never testified at trial, that there were no videos presented of him making any statements, and that all of his alleged statements came into evidence through the testimony of other witnesses recalling what he had allegedly said. Since the defendant never admitted to making any of the statements attributed to him, the defendant argues that it was error for the trial court to give the instruction without the bracketed phrase.

18

¶ 54    "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). We review *de novo* the question of whether an instruction accurately conveyed the law. *People v. Herron*, 215 Ill. 2d 167, 174 (2005). Although the committee notes to IPI Criminal No. 3.06-3.07 state that the bracketed phrase should only be deleted when the defendant admits to making all of the material statements, numerous cases have held that the instruction is proper without the bracketed phrase in circumstances where the defendant presented no evidence that he denied making the statement. See *People v. Ramos*, 318 Ill. App. 3d 181, 188 (2000) (even if not forfeited, instruction properly given without bracketed language where the defendant presented no evidence that he did not make the statements nor did witnesses testify or imply that he did not make the statements); *People v. Echols*, 382 Ill. App. 3d 309, 318 (2008) (holding that the bracketed phrase was properly omitted where the defendant did not present any evidence that he did not make the statement); *People v. Moore*, 294 Ill. App. 3d 410, 417 (1998) (instruction proper without bracketed language where the defendant did not present any evidence that he did not make the statement). These courts reasoned that to hold otherwise would confuse the jury by making it decide an issue improperly before the court. See *Ramos*, 318 Ill. App. 3d at 188 (citing *People v. Garner*, 248 Ill. App. 3d 985, 992 (1993)).

¶ 55    The defendant asks this court to hold these cases as incorrectly decided since the committee comments specifically state that the bracketed phase should *only* be deleted when a defendant admits to making all the statements. IPI Criminal No. 3.06-3.07, Committee Comments (Oct. 17, 2014). We need not make such a determination since it does not impact the outcome of this analysis. The relevant cases hold that where the testimony regarding the statement indicates, or is

19

sufficient to support an inference, that the defendant did not make the statement, the bracketed portion should be included in the instruction. See *Ramos*, 318 Ill. App. 3d at 188; *People v. Richmond*, 341 Ill. App. 3d 39, 52 (2003).

¶ 56    In this matter, the testimony of the defendant's sister, Dynasty Craig, clearly called into question whether the defendant had made certain statements. Dynasty testified that she had lied and fabricated her statement to law enforcement that the defendant had confessed to her that he had killed Kieshaun. The jury, therefore, heard the testimony of Dynasty stating that the defendant did not make that statement, but also heard the video clip played during Detective Phenicie's testimony wherein Dynasty stated that the defendant had made the statement. Thus, the jury had before it the question of whether the defendant actually made the statement. Accordingly, we find that it was an error for IPI Criminal No. 3.06-3.07 to be given to the jury without the bracketed phrase.

¶ 57                                B. Informant Testimony

¶ 58    The defendant next argues that the trial court imposed a clear and strict limit on the State concerning James Mosley's testimony. The defendant states that the State was limited to examining Mosley concerning conversations that he directly had with the defendant and that the State violated that restriction when it examined Mosley concerning conversations that he had overheard. The defendant states that the trial court's ruling was an appropriate method of prohibiting unreliable hearsay statements because there could be no way to guarantee that the conversations between the defendant and other inmates actually took place, and that Mosley accurately overheard what was said. As such, the defendant argues that the trial court erred in overruling its objection and allowing the State to question Mosley regarding conversations that he had overheard the defendant having with other inmates.

20

¶ 59    The State acknowledges that the prosecutor used the word "overheard" multiple times during its examination of Mosley, but "submits that word usage was very likely a mistake." We disagree. Mosley's testimony at trial was that he did not "*per se*" have a conversation with the defendant about the shooting, but that he was present for a conversation that the defendant had concerning the shooting. The prosecutor then asked what Mosley heard the defendant say during that conversation, at which point the defense objected to a lack of foundation.

¶ 60    The trial court's pretrial ruling held that the State's examination of Mosley was limited to the information given to Detective Phenicie at the first interview conducted on February 21, 2023. During that interview, Mosley relayed information obtained in a conversation he had with the defendant and not any information obtained from overhearing any conversations.

¶ 61    It is improper to refer to evidence which has been excluded. *People v. Mullen*, 141 Ill. 2d 394, 404 (1990). The prosecutor should have been fully aware of the trial court's pretrial ruling above, yet there was no attempt to determine what Mosley meant when he stated that he did not "*per se*" have a conversation with the defendant. Instead, the prosecutor moved on and inquired about a conversation Mosley had overheard. The report of proceedings demonstrates that the prosecutor did not limit the examination of Mosley to the conversation that he had directly with the defendant and thus, we find that the State violated the trial court's pretrial ruling. Therefore, it was error for the trial court to allow Mosley to testify concerning an overheard conversation that the trial court had previously ruled was inadmissible.

¶ 62                                    C. Hearsay

¶ 63    The final error raised by the defendant on appeal is whether the State, on numerous occasions during the trial, improperly admitted hearsay evidence. The defendant argues that the State admitted improper hearsay evidence by failing to follow the proper procedure to refresh a

21

witness's recollection or to impeach a witness with a prior statement, and instead, read massive amounts of unreliable and improper hearsay into the record. Specifically, the defendant states that portions of the testimonies given by Precious Dorris, James Mosley, Daphne Dalton, Dynasty Craig, and Dante Pickens were outright hearsay statements that did not fall within any recognized exception to the hearsay rule.

¶ 64　　The State concedes that the prosecutor erred in the examination of these witnesses, with the exception of Mosley. The State argues, however, that the failure to properly refresh these witnesses' recollection did not prejudice the defendant and was harmless error when viewed in the totality of the proper questioning by the prosecutor.

¶ 65　　Hearsay is an out-of-court statement submitted to prove the truth of the matter asserted and is inadmissible unless it falls within a recognized exception to the rule. Ill. Rs. Evid. 801(c) (eff. Oct. 15, 2015), 802 (eff. Jan. 1, 2011); *People v. Leach*, 2012 IL 111534, ¶ 66. A witness may only testify to facts within his or her knowledge and recollection, but a witness may refresh his or her memory by the use of a written instrument, memorandum, or entry in a book. *People v. Griswold*, 405 Ill. 533, 541 (1950). It is not necessary that the writing be made by the witness or be an original writing; however, once reviewed, the witness must be able to speak to the facts from their own recollection. *Id.* at 541-42.

¶ 66　　A police report may be used to refresh recollection, however, it is fundamental that a witness's memory can be refreshed only after it has been established that the witness has no memory concerning the facts in question and has testified that his or her memory has been exhausted. *People v. Shatner*, 174 Ill. 2d 133, 153-54 (1996). If a witness testified that he or she does not remember giving a particular statement to a detective, then the witness can only be impeached through the testimony of the detective to whom the statement was given. See *Id.* at 153.

22

¶ 67    As both parties recognize, the prosecutor in this matter failed to establish that the memories of Precious Dorris, Daphne Dalton, Dynasty Craig, and Dante Pickens were exhausted prior to inquiring whether or not they had made specific prior statements. None of these witnesses were offered any written instrument that may have assisted in refreshing their memory and instead, the prosecutor read numerous statements into the record without any indication of the origins or nature of the written instrument the prosecutor was reciting. The record does not reflect whether the prosecutor was reading a transcript of a recorded interview, a police report, a written statement, or some other writing related to the prior statements. As such, we find the prosecutor's improper use of the prior statements resulted in inadmissible hearsay and was in error. We further note that defense counsel offered no objection to the improper use of these statements.

¶ 68        D. Ineffective Assistance of Counsel, Plain Error, or Cumulative Error

¶ 69    Since we have determined that the above errors occurred, we must proceed to determine whether the errors constitute ineffective assistance of counsel, plain error, or cumulative error. We will begin with ineffective assistance of counsel. In determining whether a defendant received ineffective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. For counsel's performance to be deficient, the defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms. *Id.* Effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). "To establish deficiency, the

23

defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999).

¶ 70 To establish that a defendant was prejudiced by counsel's objectively unreasonable performance, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome and entails more than just an outcome determination. *Id.* "The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* Cumulative errors by defense counsel may also constitute deficient performance and prejudice under *Strickland*. See *People v. Lewis*, 2022 IL 126705, ¶¶ 84-85.

¶ 71 A defendant must satisfy both prongs of the *Strickland* test to prevail, and the failure to establish either prong, precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11. Where the facts surrounding the ineffective assistance claim are undisputed and the claim was not raised in the trial court, this court makes a *de novo* assessment of the ultimate legal issue of whether counsel rendered ineffective assistance. *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006).

¶ 72 Defense counsel in this matter made numerous errors as discussed above. Specifically, defense counsel allowed the jury to receive an incomplete jury instruction, failed to properly object to the State's violation of a pretrial motion ruling, and failed to properly object to the State's repeated use of inadmissible hearsay statements. "The constitutional guarantee of effective assistance of counsel requires a criminal defense attorney to use the applicable rules of evidence to shield his [or her] client from a trial based upon unreliable evidence." *People v. Fillyaw*, 409 Ill. App. 3d 302, 315 (2011). As aptly stated in *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996):

24

> "Considering all of the circumstances, indulged in with a strong presumption favoring reasonable professional assistance, we cannot construe the challenged performance of counsel as a matter of sound trial strategy. Sound trial strategy is made of sterner stuff. It embraces the use of established rules of evidence and procedure to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts."

¶ 73 Here, defense counsel failed to object, or improperly objected, to the admission of overheard incriminating statements and hearsay evidence; thus, allowing such evidence to be brought before the jury. Defense counsel also failed to ensure that the jury was properly instructed on the consideration of the alleged statements attributed to the defendant. Although each of defense counsel's errors alone may not rise to reversible error, we find that the cumulative effect of defense counsel's errors establishes deficient performance. Given the totality of the errors, especially the numerous amounts of hearsay admitted, we find that defense counsel's performance fell below an objective standard of reasonableness.

¶ 74 We cannot, however, provide the defendant with any relief solely on the basis of his defense counsel's deficient performance. Instead, we must determine whether the record reveals that, but for defense counsel's unprofessional errors, even if such errors were egregious, there is a reasonable probability that, but for defense counsel's unprofessional errors, the outcome of this trial could have been different.

¶ 75 Although the defendant argues that the evidence at trial was closely balanced, we disagree. Evidence is generally not closely balanced when the testimony is corroborated and uncontradicted and the witness has not been significantly impeached. *People v. Williams*, 2022 IL 126918, ¶¶ 64-65. In this matter, Dontarion Jordan, Daphne Dalton, and Megan Thatch each testified that they

personally saw the defendant shoot Kieshaun. Dontarion and Megan also testified that after seeing the defendant shoot Kieshaun, they witnessed the defendant stand over Kieshaun and continue to fire while Kieshaun was on the ground. Each of these three witnesses testified to the defendant shooting Kieshaun and their testimonies were fundamentally consistent, thus corroborating their testimonies. These witnesses were not significantly impeached, and the defendant presented no evidence that contradicted or called into question the eyewitness testimony of these witnesses.

¶ 76    Even considering the defense counsel's deficient performance, we do not find the cumulative errors rendered the result of the trial unreliable or the proceedings fundamentally unfair. Although the prosecutor did not establish that the witnesses' memories were exhausted or properly endeavored to refresh their memories before impeaching them with prior statements, the majority of that evidence was later properly perfected during Detective Phenicie's testimony. There was no evidence to contradict or call into question the testimonies of the three eyewitnesses that the defendant shot and killed Kieshaun. As such, we find that the defendant has failed to meet the prejudice prong of *Strickland* and thus, precludes the finding of ineffective assistance of counsel.

¶ 77    As previously stated, the defendant also raises the above issues under the first prong of the doctrine of plain error. Under the doctrine of plain error, a defendant must first demonstrate that a clear or obvious error occurred and then demonstrate that either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Although we determined that

26

several errors did occur, we further determined that the evidence was not closely balanced. Therefore, the defendant's arguments under the first prong of the doctrine of plain error also fail.

¶ 78    The same conclusion must be reached under the defendant's alternative argument of cumulative error. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). Where no error that may have occurred rises to the level of plain error, the defendant is not entitled to a new trial on the basis of cumulative error. See *People v. Caffey*, 205 Ill. 2d 52, 118 (2001). We have found that the defendant's claims fail under the doctrine of plain error. Accordingly, the defendant is not entitled to a new trial on the basis of cumulative error.

¶ 79                                    III. CONCLUSION

¶ 80    For the foregoing reasons, we affirm the defendant's conviction.

¶ 81    Affirmed.